Booth, Ghief Justice,
delivered the opinion of the court:
The plaintiff is a Pennsylvania corporation. On July 29, 1926, it entered into a contract with the Navy Department to do certain dredging in what was designated as “ the reserve basin ” at the League Island Navy Yard, Philadelphia, Pa. The reserve basin, as its name implies, had its depth impaired by an accumulation of silt and other deposits due to various causes. The contractor’s obligation was to remove these deposits by dredging the basin in specified areas to a depth of 30 feet to a line 20 feet from and parallel to a sea wall which skirted the basin on the north, the wall being known as the “ Broad Street Sea Wall.” The specifications provided that a-depth of but 20 feet should be maintained at the sea wall, thereby requiring dredging operations to proceed on the basis of a depth of not to exceed 25 feet *570 from a point 10 feet from the sea wall, thereafter attaining at the 20-foot line a depth not to exceed in any event 81 feet, one foot overdepth being allowed the contractor.
On March 10, 1927, while the plaintiff was dredging the basin at a point 20 or 25 feet opposite a section of the sea wall, the captain observed cracks in the wall and soon thereafter about 118 or 120 feet of the wall collapsed and fell outwardly into the water. This suit is the result of this incident. The defendant concedes that a balance of the contract price, viz, $30,499.13, has not been paid to the plaintiff. The reason for withholding it appears from a counterclaim filed herein setting up a charge against the plaintiff for the cost of replacing the collapsed wall. If the counterclaim is not sustainable, the plaintiff is entitled to judgment for the admitted balance.
The contract contained, among many others, the following express conditions:
“ 1-02. General description. — All the sections (with one exception below 18 feet) to be dredged have been dredged previously to depths equal to or greater than now required. The material to be removed is believed to consist of river silt, sand, etc., which has been deposited over the section since the last dredging.
“ 2-06. Maintaining safety of structures. — The contractor shall use reasonable and proper care in the prosecution of his work so as to assure the stability of piers, bulkheads, and other structures lying on or adjacent to the site of the work in so far as they may be jeopardized by the operations of dredging and on account of moving or mooring of equipment.
“ 2-08. Damage. — The contractor shall make good all damage resulting from his operations and he shall leave all structures in condition as good as existed before the work was begun.
“ 2-13. Character of material. — As dredging to the required depths has previously been performed, it is believed that the. material will consist of silt and sand which has been deposited by the river current.
“ 2-15. Method of measurement. — The quantity of material dredged will be determined by the Government from measurements made in original position using a sounding lead, with an enlarged base or plate to restrict penetration.
“2-17. Accuracy of dredging operations. — To cover inaccuracies of dredging processes, payment will be made for ma *571 terial actually dredged to a depth of 1 foot below the depth required.
“ 2-20. Payments. — The total quantity for which payment will be made will be determined from the results of the initial and final surveys, regardless of whether or not extra dredging has been made necessary by the deposit of material on areas already dredged. No payment will be made (a) for material dredged outside the designated areas as enlarged by the slopes specified, (b) for material dredged in excess of 1 foot below the minimum depth designated, nor (c) for material dredged but not deposited in accordance with the specification.
“ 21. Contractor's responsibility. — The contractor shall be responsible for the entire work contemplated by the contract, and every part thereof and for all tools, appliances, and property of every description used in connection therewith. All methods of work, tools, appliances, and auxiliaries of all descriptions shall be safe and sufficient, and, if found by the officer in charge not to be so, shall be made satisfactory by the contractor without delay. The contractor shall specifically and distinctly assume all risks connected with the work, and shall be held liable for all damage or injury to property used or persons employed on or in connection with the work and all damage or injury to any person or property wherever located, resulting from any action or operation under the contract or in connection with the work, and undertakes and promises to protect and defend the Government against all claims and to reimburse it for any outlay on account of any such damage or injury.”
The plaintiff in its brief and argument predicates its right of recovery; first, upon a strict compliance with the contract respecting depths dredged and the principle of law established in the case of Spearin v. United States, 248 U. S. 132, and kindred cases, specifically cited. If the contractor complied in every respect with the specifications and the record establishes that the collapse of the wall was due to faulty plans and specifications and not overdepth dredging, the rule in the Spea/rin case is applicable. As the Supreme Court said in the Spea/rin case, “ If the contractor is bound to build according to plans and specifications prepared by the owner, the contractor will not be responsible for consequences of defects in the plans and specifications.” The difficulty the advanced contention encounters is not one of law but of fact. The record is one requiring the application of what the court *572 deems, under the rules of evidence, the best and most convincing testimony to sustain or contradict pertinent and material facts. The existence of a possible doubt as to the cause of the collapse is removed by what was going on when it occurred and what had been done just prior thereto. The plaintiff and no other was dredging near the sea wall and had been for some time previous likewise engaged in dredging the reserve basin. No proof obtains that the sea wall itself was dilapidated, inherently weak, and precariously near to a collapse because of its age, construction, or previous usage so that the range of investigation and determination is limited to the questions of faulty plans and overdepth dredging. What, then, was the situation respecting these two issues? The plaintiff by simple observation must have known the care essential to observe in dredging in an area adjacent to a structure of the character of the sea wall and within limits so comparatively small. Experience warned the contractor of the exacting character of his undertaking and the prime necessity of proceeding with the utmost caution to obtain exactness. It was not difficult to ascertain with indisputable exactness the distance of 20 feet from the sea wall. Instead of resorting to an indisputable method the contractor relied upon two markers, one at the north and the other at the south side piers, neither of which he had placed there himself; and who did place them was unknown to him. The markers were from 250 to 300 feet away and the position of the dredge boat placed with reference thereto by sighting. If this is good engineering practice it is not sustained by the record, and to the court it is impressive and convincing, in an undertaking of the restrictive character here involved, as a lack of the exercise of “ reasonable and proper care ” exacted under the terms of the contract. The obligations of the contract warned the contractor of danger to the stability of “ structures lying on or adjacent to the site of the work, in so far as they may be jeopardized.” This obligation necessarily imposed the exercise of care and caution with respect to the structures enumerated, and in a suit upon the contract the burden of establishing observance of the same is upon the plaintiff. To take the risk of ascertaining distance by' a method so crude as herein resorted to deprives the record of *573 sufficient proof to sustain the contention that no dredging was done except as the contract expressly provided. On the other hand, the defendant has proven by positive evidence that soundings made immediately after the collapse disclosed overdepth dredging within prohibitive distances of from D/2 to 3y2 feet. The plaintiff challenges the probative force of this testimony because the blue prints do not show soundings directly opposite and adjacent to the collapsed wall. It was manifestly impossible to make • soundings directly adjacent to the wall, for the basin at that point was filled in by the collapsed wall and the material carried in with it. The soundings made approached this distinct area as closely as possible and two at least were within the area. In our opinion overdepth dredging caused the collapse.
There is no proof of record showing faulty plans and no evidence to sustain a finding that the specifications themselves were such as to render it impossible to attain the prescribed depths without endangering or causing the collapse of the wall. On the contrary, the record is positive that two years in advance of the original construction of the wall a depth of 30 feet for the reserve basin was determined upon and the basin brought to that depth in accord therewith. The wall was constructed and remained in place until March’ 10, 1927. In addition to this fact, notwithstanding over-depth dredging in the area adjacent to the collapse, the sea wall there remained in place. Clearly the burden of establishing the plaintiff’s contentions has not been met by the plaintiff, and the express terms of the contract prevent the giving of the relief sued for.
The plaintiff declined to replace the wall. The defendant did replace it. In so doing a somewhat more stable structure was erected. The margin of safety was increased. It is obviously difficult to estimate with precision the difference between the cost of replacement and the new structure. The defendant arrives at the figure we think upon a logical basis. The material change in the new wall consisted in the use of longer piling on the two front rows of the structure, and piles of sufficient length, in the remaining rows to develop a safe bearing capacity of from 12 to 15 tons. Drawings of the collapsed structure disclosed the number of piles per *574 bent in the old wall, but not their length. It was assumed by the defendant that the piles in the old structure were 20 feet in length, and for the difference an allowance of $550 was deducted from the Began Construction Company’s price for doing the work. While we have said the basis of the computation adopted 'by the defendant seems logical and just, we are not inclined to adopt the figures given. The new structure was an improved wall, materially increased in strength and stability, capable of bearing an increased load, designed to meet modern usages, and erected in the light of 1928 conditions. Many changes were made in the construction contract as the work proceeded, and from the figures given in the record we think $1,550 would be a just allowance. The price paid to the Regan Construction Company for the new wall was $17,545, leaving the cost of replacement at $15,995, to which must be added the sum of $2,401.76, actual cost of replacing telephone and electric wires, etc., totaling $18,396.76, for which amount the defendant’s counterclaim will be allowed. Judgment will be awarded the plaintiff for $12,102.37. It is so ordered.
Williams, Judge, and LittletoN, Judge, did not hear and took no part in the decision of this case.
GeeeN, Judge, and Giiaham, Judge, concur.